# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

BUZZFEED, INC. and BEN SMITH,
   Plaintiffs,

v.

DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington DC 20530

FEDERAL BUREAU OF INVESTIGATION
Office of General Counsel
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
Office of General Counsel
1500 Tysons McLean Drive
McLean, VA 22102

JAMES COMEY
c/o FEDERAL BUREAU OF
INVESTIGATION
Office of General Counsel
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001

and

JAMES CLAPPER
c/o OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
Office of General Counsel
1500 Tysons McLean Drive
McLean, VA 22102

   Defendants.

**Case No.**

**MOTION TO COMPEL AND
INCORPORATED MEMORANDUM OF
LAW**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

FACTUAL BACKGROUND....................................................................................2

I.      THE DOSSIER AND THE FLORIDA LITIGATION ...............................2

      A.    The Dossier ...................................................................................2

      B.    The Publication of Buzzfeed's Article with the Dossier ..................3

      C.    The Official Briefings ......................................................................4

      D.    Official Investigations of the Dossier and its Contents ....................7

      E.    The Florida Litigation ......................................................................9

II.     MOVANTS' EFFORTS TO DATE TO OBTAIN THE REQUESTED
       DISCOVERY FROM THE GOVERNMENT PARTIES ............................10

      A.    The Subpoenas ...............................................................................10

      B.    The Government's Response to the Subpoenas................................10

      C.    Movants Efforts to Narrow the Subpoenas and Meet and Confer .....11

      D.    The Limited Scope Of The Deposition(s) Movants Seek To
           Compel In This Motion....................................................................12

ARGUMENT ........................................................................................................13

      A.    The Subpoenas Seek Information Highly Relevant to BuzzFeed's Fair
           Report Privilege Defense and the Element of Falsity in the Florida
           Litigation.......................................................................................14

      B.    The Subpoenas do not Subject the Government Parties to an
           Undue Burden. ...............................................................................18

      C.    The Limited Requested Testimony Does Not Implicate any
           Bona-Fide Classified Information....................................................21

CONCLUSION......................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C.L.U. v. C.I.A.*,
   710 F.3d 422 (D.D.C. 2013) ........................................................................................... 24

*Alexander v. FBI*,
   186 F.R.D. 21 (D.D.C. 1998) ......................................................................................... 13

*Biro v. Conde Nast*,
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) ...................................................................... 14, 15

*Byers v. Burleson*,
   100 F.R.D. 436 (D.D.C. 1983) ....................................................................................... 22

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014) ........................................................................................... 15

*In re Denture Cream Prods. Liability Litigation*,
   292 F.R.D. 120 (D.D.C. 2013) ............................................................................. 14, 19, 20

*District Title v. Warren*,
   2017 WL 2462489 (D.D.C. June 2, 2017) ..................................................................... 22

*Fine v. ESPN*,
   11 F. Supp. 3d 209 (N.D.N.Y. 2014) ............................................................................. 17

*Freeze Right Refrigeration and Air Conditioning Services, Inc. v. City of New York*,
   101 A.D.2d 175 (1st Dept. 1984) ................................................................................... 15

*Global Relief Found. v. N.Y. Times Co.*,
   2002 WL 31045394 (N.D.Ill., Sept. 11, 2002) .............................................................. 16

*Global Relief Found. v. N.Y. Times Co.*,
   390 F.3d 973 (7th Cir. 2004) ............................................................................... 15, 16, 17

*Global Relief Found. v. O'Neill*,
   315 F.3d 748 (7th Cir. 2002) ......................................................................................... 16

*Goldstein v. F.D.I.C.*,
   494 B.R. 82 (D.D.C. 2013) ............................................................................................ 23

*Guccione v. Hustler Magazine, Inc.*,
    800 F.2d 298 (2d Cir. 1986) .......................................................................................... 15

*Klayman v. Judicial Watch, Inc.*,
    22 F. Supp. 3d 1240 (S.D. Fla. 2014) ........................................................................... 15

*Marino v. Drug Enforcement Admin.*,
    685 F.3d 1076 (D.D.C. 2012) ........................................................................................ 24

*Montesa v. Schwartz*,
    2015 WL 13016354 (S.D.N.Y. Nov. 3, 2015) ............................................................... 21

*N.Y. Times v. D.O.J.*,
    756 F.3d 100 (2d Cir. 2014) .......................................................................................... 23

*OAO Alpha Bank v. Center for Public Integrity*,
    387 F.Supp.2d 20 (D.D.C. 2005) ........................................................................ 15, 17, 18

*Ortega v. Post-Newsweek Stations, Florida, Inc.*,
    510 So.2d 972 (Fla. Dist. Ct. App. 1987) ...................................................................... 15

*Smith v. C.I.A.*,
    2017 WL 1194166 (D.D.C. Mar. 30, 2017) ................................................................... 24

*Steven H. v. Duval County School Bd.*,
    1999 WL 1427666 (M.D. Fla. Sept. 3, 1999) .......................................................... 14, 15

*Tuite v. Henry*,
    98 F.3d 1411 (D.C. Cir. 1996) ....................................................................................... 25

*U.S. Dept of the Treasury v. Pension Benefit Guaranty Corp.*,
    301 F.R.D. 20 (D.D.C. 2014) ......................................................................................... 19

*U.S. v. AT&T, Inc.*,
    2011 WL 5347178 (D.D.C. Nov. 6, 2011) ................................................................ 19, 21

*Watts v. Sec. Exchange Comm.*,
    482 F.3d 501 (D.C. Cir. 2007) .................................................................................. 13, 18

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) ....................................................................................... 18

*Williams v. Schrader*,
    2012 WL 1060159 (S.D. Fla. Mar. 28, 2012) ............................................................... 15

*Wolf v. C.I.A.*,
    473 F.3d 370 (D.C. Cir. 2007) .................................................................................. 22, 23

4831-3301-6910v.8 0100812-000009

**Other Authorities**

Fed. R. Civ. P. § 26 .......................................................................................................... 1, 18

Fed. R. Civ. P. § 45 .......................................................................................................... 1, 18

*Restatement of Torts* § 611, cmt. f ....................................................................................... 15

iv

BuzzFeed, Inc. ("BuzzFeed") and Ben Smith ("Smith") (collectively, "Movants") submit this memorandum of law in support of their motion to compel the Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), James Comey ("Comey"), and if necessary the Office of the Director of National Security ("ODNI") and/or James Clapper ("Clapper") (collectively, the "Government Parties") to comply with those portions of the subpoenas issued to them pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, as substantially narrowed for purposes of bringing this motion.[1]

## PRELIMINARY STATEMENT

This is a case in which a news organization, its chief editor and several reporters are being sued for having published information that lies at the heart of one the most important political stories of our day:  Russia's efforts to interfere with the 2016 United States presidential election.  The underlying Complaint in this action, *Gubarev et al. v. BuzzFeed, Inc.*, No. 17-cv-60426-UU, pending in the Southern District of Florida (the "Florida Litigation"), asserts a claim for defamation based upon an article published by defendant BuzzFeed in January 2017 entitled "These Reports Allege Trump Has Deep Ties to Russia" (the "Article").  The Article includes an embedded document file containing a 35-page collection of memoranda that primarily discuss Russian efforts to influence the 2016 U.S. Presidential election, including alleged ties between Russia and the campaign of President Trump.  The collection of reports has since been popularly dubbed "the Trump Dossier" (the "Dossier").  The Plaintiffs in the Florida Litigation assert that they were falsely identified in the penultimate paragraph of the Dossier as having been involved in Russian efforts to hack Democratic political operatives.

The Article reports, and provides hyperlinks to other news reports that further explain, that the Dossier is a document originally written by a British investigator.  The Article describes how by January 10, 2017, the Dossier had become the subject of multiple forms of official government activity.  Those official actions included, at the very least, briefings provided to

---

[1] The exhibits supporting this motion are annexed to the Declaration of Nathan Siegel, sworn to the 27th day of September 2017 (the "Siegel Declaration" or "Siegel Dec.").

President Obama, President-elect Trump and Congressional leadership by officials from multiple agencies; an investigation by the FBI and possibly other agencies; and actions by two United States Senators who reviewed and referred the Dossier to the FBI.

Beginning the day after Buzzfeed's publication and continuing to the present, the Government Parties and other government officials, including the President, have spoken frequently and publicly about their official conduct with the Dossier. One of Defendants' key defenses in the Florida Litigation is the legal privilege which defamation law recognizes for reporting about official government action, including documents that become the subject of official conduct. However, in order to establish this privilege, often called the "fair report" privilege, Movants need documents and/or testimony from the Government Parties confirming their official actions. The same information would also, at least under the laws of some states, demonstrate that the Article was accurate, and therefore Plaintiffs cannot meet their burden of proving any actionable, false statements.

In large part, this Motion merely seeks to compel the Government Parties to provide this information by providing very limited testimony under oath about the matters they have already publicly discussed. The testimony that Defendants seek is therefore very narrow, poses no substantial burden, there is no other means to obtain it in admissible form and the issues presented by this lawsuit are of unusual public importance. For these reasons, the Government Parties should be compelled to comply with the as-narrowed subpoenas served in connection with the Florida Litigation.

## FACTUAL BACKGROUND

## I.    THE DOSSIER AND THE FLORIDA LITIGATION

### A.    The Dossier

By way of background, the underlying Florida Litigation arises out of Buzzfeed's publication of the Article and embedded Dossier on January 10, 2017. See Siegel Dec., Ex. 1 ("Compl."). The Dossier consists of a series of memoranda written between June and December

2

2016 by a private British intelligence company founded by Christopher Steele, a former British government intelligence officer.  Its contents primarily (though not exclusively) concern "Russian efforts to influence the U.S. Presidential election process and links between Russia and Donald Trump."  Siegel Dec., Ex. 36 at ¶ 9.  Multiple news reports and public statements, including by some of the Government Parties here, make clear that by the time the Article was published the Dossier had become the subject of substantial official activity.

For example, as the Article notes, during the 2016 election campaign then Senate Minority Leader Harry Reid publicly released two letters he wrote to then-FBI Director James Comey, which asked the FBI to make public information about alleged Russian collaboration with the Trump campaign.  *Id.*, Exs. 11-12.  Those letters apparently relied in part on Reid's review of the Dossier.  *Id.*, Ex. 19.  In November 2016, a former British diplomat made Senator John McCain aware of the Dossier.  Senator McCain subsequently reviewed it and delivered it to the FBI.  *Id.*, Ex. 18.  According to multiple news reports, the FBI had obtained the Dossier much earlier directly from its authors, and continued to do so as it was updated.  *Id.*, Ex. 13.

### B.      The Publication of Buzzfeed's Article with the Dossier

On January 10, 2017, CNN reported that a two-page synopsis of the document had been given to President Obama and President-elect Trump, and that both had been briefed on its general contents.  Siegel Dec., Ex. 23.  CNN also reported that the FBI was investigating the Dossier's allegations.  *Id.*  Shortly thereafter, BuzzFeed published the Article with the embedded Dossier.  The Dossier was viewed by approximately 5.9 million people prior to the commencement of the Florida Litigation on Buzzfeed's website alone, and has since been republished elsewhere.  *See, e.g., id.*, Ex. 15.

The Article explained that the memos in the Dossier had been "circulating among elected officials, intelligence agents, and journalists for weeks."  Compl., Ex. 2 at 1-2.  The Article summarized what had been reported (though not formally confirmed) about official use of the Dossier up to that point, including by hyperlinking to the CNN and *Mother Jones* reports:

3

the Dossier's use in briefing the President and President-elect, the actions by Senators Reid and McCain, and (in the hyperlinked reports) an FBI investigation into its content. *Id.* The Article made clear that the allegations in the Dossier were, at that point in time, "unverified," and it noted a couple of factual errors that Defendants noticed in the document. *Id.*

### C.   The Official Briefings

The day after Buzzfeed's publication, President-elect Trump and his Secretary gave a press conference which offered a detailed response to multiple allegations in the Dossier, and implied the intelligence agencies may have leaked it. Siegel Dec., Ex. 20. In response, that same day the Office of the Director of National Intelligence released an official statement from then-Director James Clapper. *Id.*, Ex. 21. The statement confirmed that Director Clapper and then-President-Elect Trump discussed "the private security company document . . . which was circulated in recent months among the media, members of Congress and congressional staff even before the [Intelligence Community] became aware of it." *Id.* The statement explained that the intelligence community had not, at that point, formed a judgment about the document's reliability, but that "part of our obligation is to ensure that policymakers are provided with the fullest possible picture of any matters that might affect national security." *Id.*

On January 12, Vice-President Biden also publicly confirmed that he and then-President Obama had been briefed about the Dossier, and explained that he understood it was "something that obviously the agency [the FBI] thinks they have to track down." Siegel Dec., Ex. 22 at 2. Later, on June 7, Mr. Clapper elaborated on the briefing and stated that President Trump had asked him to publicly refute the Dossier, which Mr. Clapper "could not and would not do." *Id.*, Ex. 47 at 2. Senator McCain also released a statement on January 11, confirming his actions with respect to the Dossier. *Id.*, Ex. 18.

In his highly publicized testimony before the Senate Intelligence Committee on June 8, Mr. Comey began by issuing a written statement that described in detail his briefing of President-elect Trump on the Dossier's contents. Siegel Dec., Ex. 48. Notably, the Committee's

Chairman, Senator Richard Burr, had opened the hearing by asking the participants not to cover "any questions that might get into classified information", so it was clear that any ground covered in Mr. Comey's written or oral public testimony did not implicate any classified information.  Siegel Dec., Ex. 49 at 2.  Mr. Comey explained that he briefed the President-elect about the Dossier on January 6 as part of a larger briefing on the Intelligence Community's findings about Russian interference in the 2016 election.  *Id.*, Ex. 48.

Specifically, Mr. Comey said that he met with "then-President-Elect Trump on Friday, January 6 in a conference room at Trump Tower in New York . . . to brief him and his new national security team on the findings of an [Intelligence Community] assessment concerning Russian efforts to interfere in the election." *Id.* at 1.  Mr. Comey added that he then spoke alone "with the President-Elect to brief him on some personally sensitive aspects of the information assembled during the assessment," again referring to the allegations contained in the Dossier. *Id.* Mr. Comey explained that Mr. Clapper asked him to do "this portion of the briefing because I was staying in my position and because the material implicated the FBI's counter-intelligence responsibilities." *Id.*  Director Comey also explained that the Intelligence Community "leadership thought it important, for a variety of reasons, to alert the incoming President to the existence of this material . . . [in part because] to the extent there was some effort to compromise an incoming President, we could blunt any such effort with a defensive briefing." *Id.*

Finally, in an interview with *The New York Times* on July 19, President Trump himself confirmed that Director Comey briefed him about the Dossier two weeks prior to his inauguration.  He also accused Mr. Comey of doing that in order to signal to the President-elect that he had "leverage" over him, in an effort to keep his job as FBI Director:

> TRUMP: Well, I thought originally it might have had to do something with the payment by Russia of the D.N.C. Somewhere I heard that. Like, it was an illegal act done by the D.N.C., or the Democrats. That's what I had heard. Now, I don't know where I heard it, but I had heard that it had to do something with illegal acts with respect to the D.N.C. Now, you know, when you look at the kind of stuff that came out, that was, that was some pretty horrific things came out of that. But that's what I had heard. But I don't know what it means. All I know is this: When

somebody calls up and they say, "We have infor—" Look what they did to me with Russia, and it was totally phony stuff.

HABERMAN: Which, which one?

SCHMIDT:  The dossier.

TRUMP:  The dossier.

HABERMAN:  The dossier. Oh, yes.

————————

TRUMP:  Now, that was totally made-up stuff, and in fact, that guy's being sued by somebody. … And he's dying with the lawsuit. I know a lot about those guys, they're phony guys. They make up whatever they want. Just not my thing — plus, I have witnesses, because I went there with a group of people. You know, I went there with Phil Ruffin——

HABERMAN: Oh, I didn't know that.

————————

TRUMP:  I had a group of bodyguards, including Keith [Schiller] —

HABERMAN:  Keith was there, right?

TRUMP:  Keith was there. He said, "What kind of crap is this?" I went there for one day for the Miss Universe contest, I turned around, I went back. It was so disgraceful. It was so disgraceful.

————————

TRUMP: When he [James B. Comey] brought it [the dossier] to me, I said this is really made-up junk. I didn't think about anything. I just thought about, man, this is such a phony deal.

HABERMAN:  You said that to him?

TRUMP:  Yeah, don't forget——

————————

TRUMP:  I said, this is — honestly, it was so wrong, and they didn't know I was just there for a very short period of time. It was so wrong, and I was with groups of people. It was so wrong that I really didn't, I didn't think about motive. I didn't know what to think other than, this is really phony stuff.

SCHMIDT:  Why do you think — why do you think he shared it?

6

TRUMP:  I think he shared it so that I would — because the other three people left, and he showed it to me.

_____

TRUMP:  So anyway, in my opinion, he shared it so that I would think he had it out there.

SCHMIDT:  As leverage?

TRUMP:  Yeah, I think so. In retrospect. In retrospect.

Siegel Decl. Ex 63 at 15-16.

Finally, White House spokespersons have also acknowledged the existence of the Dossier several times, largely in order to try to discredit it.  For example:

SARAH HUCKABEE SANDERS:  Often, we have a lot of media with Russia first, but today, there was public testimony that further discredited the phony dossier that's been the source of so much of the fake news and conspiracy theories, and we learned that the firm that produced it was also being paid by the Russians.  Siegel Dec., Ex. 64 at 21.

SARAH HUCKABEE SANDERS:  The Democrat-linked firm, Fusion GPS, actually took money from the Russian government while it created the phony dossier that's been the basis for all of the Russia scandal fake news.  Siegel Dec., Ex. 65 at 4.

### D.  Official Investigations of the Dossier and its Contents

The January 10 CNN report, to which the Article hyperlinked, also reported that "[t]he FBI is investigating the credibility and accuracy of these allegations . . . but has not confirmed many essential details in the memos about Mr. Trump."  Siegel Dec., Ex. 23.  Subsequently, the Government Parties here have publicly acknowledged the existence of one or more official investigations into the Dossier's contents.

On May 23, 2017 former CIA Director Brennan testified before the House Intelligence Committee and directly confirmed his understanding that there was an FBI investigation:

REP. GOWDY:  Director Brennan, do you know who commissioned the Steele dossier?

DIRECTOR BRENNAN: I don't.

GOWDY: Do you know if the FBI paid for any – portion of the Steele dossier?

BRENNAN: I don't know. I know that there are press reports related to that, but I – I don't know, I have no firsthand knowledge of that.

GOWDY: Do you know whether any of the underlying allegations made in the Steele dossier were ever tested, probed, examined, cross- examined, whether the sources were examined for reliability, credibility?

BRENNAN: I know that there were efforts made by the Bureau to try to understand whether or not any of the information in that was valid, but I just – I don't have any firsthand knowledge of it.

Siegel Decl. 45 at 32-33.  And on May 8, former Director Clapper testified before the Senate Judiciary Committee and implicitly confirmed that one or more law enforcement and/or intelligence agencies had made efforts to investigate the basis of the Dossier's allegations, prior to briefing President Obama and President-elect Trump on January 6 about the Intelligence Community's assessment of Russian interference in the 2016 election:

SENATOR GRAHAM:  Follow up on that, are you familiar with a dossier about Mr. Trump compiled with some guy in England?

DIRECTOR CLAPPER: I am.

GRAHAM: Did you find that to be a credible report?

CLAPPER: Well, we didn't make a judgment on that. And that's — that's one reason why we did not include it in the body of our intelligence community assessment.

GRAHAM: You didn't find it credible enough to be included?

CLAPPER: We couldn't corroborate the sourcing, particularly the second — third-order sources.

Siegel Decl. 41 at 10.

Finally, in his written statement provided to the Senate Intelligence Committee and released to the public on June 7, Director Comey explained at length why the Dossier would be the kind of document that could trigger a counter-intelligence investigation, but that he told President-elect Trump in his briefing that there was no such investigation directed at him personally.  Siegel Dec., Ex. 48 at 4.  Director Comey also related how President Trump

8

subsequently brought up the more salacious allegations of the Dossier with him on other occasions, and Comey continued to tell him that he was not personally the target of any investigation.  *Id.*

E.   **The Florida Litigation**

Plaintiffs in the Florida Litigation are Aleksej Gubarev, an alleged "venture capitalist and tech expert" as well as XBT Holdings, S.A. and Webzilla, Inc., companies founded by Mr. Gubarev that "specialize in internet hosting, data and web-development" (collectively, "Plaintiffs").  *See* Compl. ¶ 16.  Plaintiffs filed their Complaint on February 3, 2017 in the Circuit Court of the Seventeenth Judicial Circuit for Broward County, Florida, and it was subsequently removed to the Southern District of Florida.  *Id.*  Plaintiffs assert one claim for defamation, specifically alleging that the following allegations in the Dossier are false:

> [O]ver the period March-September 2016 a company called XBT/Webzilla and its affiliates had been using botnets and porn traffic to transmit viruses, plant bugs, steal data and conduct "altering operations" against the Democratic Party leadership.  Entities linked to one Aleksei GUBAROV were involved and he and another hacking expert, both recruited under duress by the FSB, Seva KAPSUGOVICH, were significant players in this operation. . . . It was important in this event that all cash payments owed were made quickly and discreetly and that cyber and other operators were stood down/able to go effectively to ground to cover their traces.

*See id.* ¶¶ 26-27 & Ex. C at 35.

In their Answer, Movants assert as their first Affirmative Defense that publication of the allegedly defamatory statements in the Dossier, within the context of the Article, is protected by the fair report privilege pursuant to state statutes, common law and/or the First and Fourteenth Amendments to the Constitution of the United States.  See Siegel Dec., Ex. 2.

9

## II.    MOVANTS' EFFORTS TO DATE TO OBTAIN THE REQUESTED DISCOVERY FROM THE GOVERNMENT PARTIES

### A.    The Subpoenas

BuzzFeed issued seven subpoenas and accompanying *Touhy* affidavits to the Government Parties on June 28, 2017 (the "Subpoenas"), pursuant to the regulations of each of the subpoenaed agencies.  Siegel Dec. ¶ 3 & Exs. 3-5.  The Subpoenas sought documents and testimony from a designated representative of four agencies:  The Department of Justice, FBI, CIA and the Office of the Director of National Intelligence.  *Id.* ¶¶ 3-6 & Exs. 3-5.  It also sought documents and testimony from three former officials of those agencies:  former FBI Director James Comey, former CIA director John Brennan, and former DNI James Clapper.  *Id.*

From the agencies, the Subpoenas did not seek all documents or testimony concerning the Dossier, but rather only sought information likely to be directly relevant to the Florida Litigation. In summary, the Subpoenas sought documents and testimony related to (1) when and in what form the agencies received the Dossier; (2) any use of the Dossier in judicial proceedings; (3) communications with Christopher Steele; (4) communications about the Dossier with members of Congress; (5) any synopsis provided to Presidents Obama and Trump; and (6) any investigation of the allegations against the Plaintiffs in the Florida Litigation.  The Subpoenas also sought testimony focused on the public statements the individual Government Parties had already made about the Dossier.  *See generally*, Siegel Dec., Exs. 3-5.

### B.    The Government's Response to the Subpoenas

All of the agencies accepted service, on their own behalves and for the individuals, on varying dates such that all service was accepted by July 20, 2017.  *Id.* ¶ 3.  On August 18, 2017, the ODNI and Mr. Clapper responded to their Subpoenas and declined to produce records or

4831-3301-6910v.8 0100812-000009

provide any testimony.  *See id.* ¶ 7 & Ex. 6.[2]  The DOJ, FBI and Mr. Comey responded on August 25 and took the same position.  *Id.* ¶ 8 & Ex. 8.

ODNI and Brennan stated that they would neither confirm nor deny the existence of responsive information, but that, assuming it exists, compliance with their Subpoenas would (1) pose an undue burden, (2) "could allow for the disclosure of privileged, confidential, or classified information"; (3) "could potentially cause harm to the nation's security", and/or (4) "may" violate the Privacy Act.  Siegel Dec., Ex. 6.  With respect to the DOJ, FBI, and Mr. Comey, they began their objections by asserting that "none of the Respondents has confirmed or denied the existence of the alleged 'Dossier'", even though the document was at the heart of much of Mr. Comey's public statement and testimony on June 8, 2017.  *Id.*, Ex. 8.  Otherwise, those Government Parties asserted that compliance would (1) pose an undue burden, (2) reveal investigative details protected by the law enforcement privilege, (3) may implicate classified information, and/or (4) might violate the Privacy Act.  Siegel Dec., Exs. 6-8.

### C.      Movants Efforts to Narrow the Subpoenas and Meet and Confer

Counsel for the Movants met and conferred with counsel for the Government Parties in person on September 8, 2017.  *Id.* ¶ 9.  For purposes of attempting to reach agreement, Movants offered to very substantially narrow the scope of what the Subpoenas sought.  Movants offered to withdraw the Subpoenas to the CIA and Mr. Brennan entirely; to withdraw all of the requests for documents in the remaining Subpoenas; and to seek very limited testimony from only one or two witnesses designated by the agencies (most likely, but not necessarily Mr. Comey, and if necessary Mr. Clapper) concerning roughly ten topics covering the public statements previously made about briefings, the existence of an investigation, and merely confirming the receipt of materials from Senator McCain.  *Id.* ¶ 9 & Ex. 9.  Notably, the proposed narrowed requests

---

[2] The CIA and Mr. Brennan likewise responded on August 18 and declined to produce anything. However, as explained in more detail below, as part of an effort to substantially narrow the Subpoenas, Movants are not seeking to compel compliance with any aspect of those Subpoenas. As a result, those responses are not discussed herein.

4831-3301-6910v.8 0100812-000009

eliminated all of the examples the Government had specifically identified in its objections as potentially implicating privileged, classified, or Privacy-Act protected materials.

On September 15, the Government responded to Defendants' proposed narrowed subpoenas, and once again declined to comply with any of the narrowed requests for a limited deposition. Siegel Dec. ¶ 10 & Ex. 10. The Government again maintained that "Respondents have never confirmed or denied the existence of the so-called "Dossier" or any investigation or other activities related to it." *Id.* at 2. The Response then seemed to qualify that assertion to some degree, noting obliquely that "[s]tatements made by former government officials in their individual capacity after they are no longer serving as government officials do not constitute official government acknowledgements." *Id.* The Government declined to comply with the narrowed subpoenas primarily on the ground that the requested testimony would "implicate classified information and/or require the Respondents to confirm or deny the existence of classified information." *Id.* at 2.

**D.      The Limited Scope Of The Deposition(s) Movants Seek To Compel In This Motion**

In this Motion, Movants are seeking slightly narrower discovery than even what they proposed to the Government Parties after their objections were served. Specifically, Movants ask the Court to compel the Government Parties to produce a designated witness from the DOJ/FBI with knowledge of the following topics for a deposition, whose scope would be limited to questions within the listed topics. If no single witness from DOJ/FBI can speak to all of the listed topics, then Movants seek a designated witness from ODNI who could speak to the remaining topics. Movants seek to compel no more than two witnesses who could each address specific topics within their knowledge. The specific topics are:

1.      Whether the content of the Dossier was being investigated as of January 10.

2.      Whether the Dossier was the subject of a counter-intelligence investigation, or any other form of investigation, as of January 10.

3.      Whether DOJ had all the pages of the Dossier that BuzzFeed published as of January 10.

4.      That Mr. Comey confirm his written statement to the Senate about his January 6 briefing of President-elect Trump.

5.      Whether a summary of the Dossier's contents was included in material provided to President-elect Trump.

6.      Whether Mr. Comey participated in briefing President Obama about the Dossier on or about January 6 in his official capacity as the FBI Director.

7.      Whether DOJ/FBI received the Dossier from Senator McCain's office on December 9, and whether DOJ/FBI received anything else subsequently from Senator McCain's office or any other representative of Senator McCain.

8.      That Brennan, Clapper and Rogers also participated in briefing President Obama about the Dossier on January 6, in their official capacities and provided a written synopsis of the Dossier.

9.      That agencies of the US Government were attempting to verify the contents and sourcing of the Dossier prior to January 10, as referenced in Mr. Clapper's May 8 testimony before the Senate Judiciary Committee.

## ARGUMENT

As an initial matter, "[d]isputes over third-party subpoenas to agencies in civil litigation [] must commence in the district court under Rule 45." *Watts v. Sec. Exchange Comm.*, 482 F.3d 501, 503 (D.C. Cir. 2007).  "Federal Rule of Civil Procedure 45 authorizes court-issued subpoenas to obtain discovery from third parties and Rule 26, which generally governs civil discovery, provides [that] [p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." *Id.* at 507.  Rule 45 requires that the district court enforce subpoenas over agencies' objections so long as the subpoenas do not call for privileged matter or would cause an undue burden. *Id.* at 508. *See also Alexander v. FBI*, 186 F.R.D. 21, 43 (D.D.C. 1998) ("A motion to compel for failure to provide relevant information sought through discovery requires the court to determine if the materials or testimony sought are relevant to the action and whether all or part of the materials or testimony are covered by a privilege that prevents its disclosure.").

4831-3301-6910v.8 0100812-000009

As discussed in greater detail below, the Government Parties should be compelled to produce the witnesses(es) requested for the limited testimony sought because (1) it is relevant, and indeed critical to BuzzFeed's defense of the case; (2) the requests as narrowed are very limited in scope and would not be unduly burdensome; (3) the Florida Litigation presents issues of unusual public importance; and (4) the discovery sought is tailored to public statements made by the Government Parties, so any claim of classification and/or privilege is unlikely to have merit.  In any event, all this Motion seeks is an order compelling the Government Parties to produce a witness, or if necessary two, to appear for a deposition limited to the specific topics. The Government would remain free to assert privilege to any particular question at a deposition, and any disputes regarding privilege could then be adjudicated on the basis of an actual record. Thus, the modest relief requested here easily meets the standards of Rule 45.

A.      **The Subpoenas Seek Information Highly Relevant to BuzzFeed's Fair Report Privilege Defense and the Element of Falsity in the Florida Litigation.**

The limited information sought in the Subpoenas — seeking to confirm the existence of a government investigation into the contents of the Dossier and the Government Parties' use of the Dossier as a basis for briefing government officials — is clearly relevant within the meaning of the Federal Rules.  "For purposes of discovery, relevance is liberally construed[,]" and "with respect to a Rule 45 subpoena, a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *In re Denture Cream Prods. Liability Litigation*, 292 F.R.D. 120, 123 (D.D.C. 2013).

In fact, the requested information here is highly relevant to BuzzFeed's ability to establish that the publication of the Article, including the Dossier, is a fair and accurate report of records that were a basis of official government actions and thus is protected by a fair report privilege pursuant to state statute, common law and/or the First and Fourteenth Amendments to the Constitution of the United States.  *See, e.g., Biro v. Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012); *Steven H. v. Duval County School Bd.*, 1999 WL 1427666, at *1 (M.D. Fla. Sept. 3, 1999).  The same information could also establish that the Article is not false, because it

14

accurately reports that the Dossier has been the subject of official government activity while making clear that the underlying allegations in the Dossier itself had not been verified when it was published. *Global Relief Found. v. N.Y. Times Co.*, 390 F.3d 973 (7th Cir. 2004). *See also, e.g., Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) ("[f]alsity of a statement is needed to make out a claim of libel."); *Williams v. Schrader*, 2012 WL 1060159, at *1 (S.D. Fla. Mar. 28, 2012). *See also, Guccione v. Hustler Magazine, Inc*., 800 F.2d 298, 301 (2d Cir. 1986) (citation omitted); *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1253 (S.D. Fla. 2014). "Importantly, the whole point of the privilege is that journalists need to be able to report on official conduct without being placed in the position of independently verifying whether defamatory allegations that may arise in the course of official activity are accurate." *Restatement of Torts* § 611, cmt. f.

 The parties in the Florida Litigation have a dispute regarding which state's law applies to the Plaintiffs' defamation claim, but the evidence sought here is important to their defenses under any potential choice of law. Generally, "[t]he privilege extends to "the report of any official proceeding, or any action taken by any officers or agency of the government of the United States, or of any State or of any of its subdivisions."" *OAO Alpha Bank v. Center for Public Integrity*, 387 F.Supp.2d 20, 40 (D.D.C. 2005), *quoting* Restatement (Second) of Torts § 611 cmt. d (1977). The fair report privilege thus protects news reports that "concern[] activities which are within the prescribed duties of a public body. The test is whether the report concerns action taken by a person officially empowered to do so." *Freeze Right Refrigeration and Air Conditioning Services, Inc. v. City of New York*, 101 A.D.2d 175, 182 (1st Dept. 1984). *See also Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So.2d 972, 976-77 (Fla. Dist. Ct. App. 1987) ("[i]n light of the difficulty in obtaining independent corroboration of" non-public government activity, "the press may often have to rely on materials the government acquires if it is to report on [such investigations] at all.").

 The privilege applies so long as the report of official conduct is "fair and accurate." *See Biro*, 883 F. Supp. 2d at 477; *Steven H.*, 1999 WL 1427666, at *1. BuzzFeed's Article

15

reports about several "activities that are within the prescribed duties of a public body":  an agency investigation, briefings of the President and President-elect, and conduct by at least two United States Senators.  Compl., Ex. 2 at 1-2.  This motion merely seeks very limited testimony that BuzzFeed needs to verify that the official actions summarized by the Article actually took place.

Three cases that presented similar scenarios illustrate why the testimony Movants seek is highly relevant.  In *Global Relief*, multiple news organizations published reports that federal law enforcement agencies were investigating certain charities for allegedly providing material support to terrorist organizations.  The charities sued for defamation, and the news organizations' motion to dismiss was denied because at that point in the proceedings there was no record to establish that the investigation had in fact taken place.  *Global Relief Found. v. N.Y. Times Co.*, 2002 WL 31045394, *8 (N.D.Ill., Sept. 11, 2002) ("At this point, however, the defendants have not established the truth of their statements [that the plaintiffs were being investigated].").

Subsequently, the defendant news organizations "produced affidavits from government sources confirming that the government was in fact investigating GRF for links to terrorist groups." *Global Relief*, 390 F.3d at 980.  Specifically, the defendants produced affidavits from "FBI Special Agent Brent Potter and OFAC [the Treasury Department's Office of Foreign Asset Control] Director Richard Newcomb, demonstrating that the government was in fact investigating GRF for links to terrorism at the time these reports were issued." *Id.* at 983. The Seventh Circuit affirmed that summary judgment was properly entered at that point because that testimony established that the challenged news reports were substantially true.

In *Global Relief* the defendants did not need to subpoena any agencies, because they were able to utilize affidavits that had been filed by the government on the public docket of other litigation that was pending between the plaintiff charity and the government at the same time. *See Global Relief Found. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002).  Movants are not aware of any similarly specific, publicly-available testimony concerning the Dossier, and so they need the relief requested here to obtain it.

16

Similarly, in *Fine v. ESPN*, 11 F. Supp. 3d 209 (N.D.N.Y. 2014), ESPN aired several news reports about allegations that an assistant basketball coach at Syracuse University had sexually molested two ball boys, and that his wife was aware of the abuse.  The ESPN reports featured excerpts from an audiotape made by one of the accusers of a conversation with the coach's wife.  By the time ESPN reported the story, the audiotape had been provided by private parties to both local police and the FBI as part of their investigation of the abuse allegations.

*Fine* held that to the extent that ESPN's reports "quote from or describe the tape", those portions of its reports would likely be privileged because they describe materials submitted to and investigated by law enforcement.  *Id*. at 218.  Nonetheless, as in *Global Relief, Fine* held that is was premature to conclusively resolve the privilege issue on a motion for judgment on the pleadings, because the authenticity of both the audiotape and the related law enforcement records were disputed in the Complaint and had not yet been the subject of any discovery.  Here, all of the defamatory statements alleged by the Plaintiffs are contained within the Dossier, which was published verbatim and in its entirety.  But as in *Fine,* Movants seek discovery to establish record facts to support their privilege defense.

Finally, the facts here also closely resemble a case from this Court which considered the application of the fair report privilege to another dossier, albeit one that was compiled and forwarded to investigative authorities in Russia.  *See OAO Alpha Bank* , 387 F.Supp.2d 20. That dossier was also a collection of anonymous allegations of criminal conduct by the plaintiffs, which in that case were Russia's largest bank and two of its wealthiest citizens.  That dossier was sent to the Chairman of the Security Committee of the Russian Duma, who then forwarded it to Russian law enforcement authorities for investigation.[3]

---

[3] The Defendants in *OAO Alfa-Bank* began their motion for summary judgment by asserting that  "[t]he challenged article is a fair and accurate report of an official action taken by Viktor Ilyukhin, Chairman of the Security Committee of the State Duma (the lower house of the Russian Federation Parliament); namely, a dossier that the Security Chairman was given . . ."  Siegel Decl. Ex. 69 at 1.  Most of the Plaintiffs in *OAO Alfa-Bank* are also discussed in the Dossier, and several have also sued the Defendants in a defamation case pending in state court in New York City.  *See Fridman, et.al. v. BuzzFeed, et.al.,* Index No. 154895/2017 (Sup., N.Y. Cty.).

Judge Bates found that the document met all the requirements for the fair report privilege, except that the privilege does not apply to actions taken by officials of foreign governments. *Id.* at 41-42. By contrast, this case involves essentially the same type of official conduct regarding the transmission and use of the Dossier by U.S. government agencies and officials. The Florida Litigation therefore presents facts quite similar to *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990), where this Circuit held the privilege applied to a report about letters written by a police union to the Mayor, who then passed them on to law enforcement which proceeded to investigate. *Id.* at 527 ("it would be untenable to make a distinction between a report about an official proceeding and that which, for all purposes, is the subject matter of the proceeding").

There is thus no question that the very narrow, limited-in-scope materials and testimony sought by Movants is highly relevant to potentially establishing their fair report defense, and rebutting the element of falsity, in the Florida Litigation.

**B.      The Subpoenas do not Subject the Government Parties to an Undue Burden.**

The Government Parties will not suffer an undue burden if ordered to comply with the Subpoenas, as heavily narrowed by the Movants. Movants recognize that "discovery under Rules 26 and 45 must properly accommodate the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations." *Watts*, 482 F.3d at 509. In doing so, courts must weigh a number of factors relevant to the question of undue burden, including "whether the discovery is unreasonably cumulative or duplicative, whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive; and whether the burden or expense of the proposed disocvery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation and the importance of the proposed discovery in resolving the issues." *Id.* (internal marks omitted). Notably, it is the

"party opposing the motion to compel [who] carries a 'heavy' burden of persuasion." *U.S. v. AT&T, Inc.*, 2011 WL 5347178, at *5 (D.D.C. Nov. 6, 2011).  Here, Movants seek very limited information — highly relevant to their defenses — that is not available from anyone other than the Government Parties.  Accordingly, compliance with the as-narrowed Subpoenas does not impose an undue hardship.

*First*, the Government Parties cannot credibly argue that the Subpoenas request duplicative or cumulative materials.  Rather, Movants seek information that by its nature is uniquely within the government's possession, i.e. whether it has investigated and conducted briefings based on the same Dossier which Buzzfeed published.  *Second*, Movants cannot obtain the requested materials from any alternative sources.  In fact, Movants are aware of no other specific sources of publicly available, sworn testimony conclusively confirming the existence, timing, and scope of law enforcement and/or intelligence agency investigations into the Dossier.  Nor is there another means by which to obtain this information from anyone other than the Government Parties.  *Denture Cream*, 292 F.R.D. at 127 (finding that the requested discovery was unavailable from other sources where the subpoenaed entity was responsible for maintaining that information).  Indeed, several news organizations, including BuzzFeed, have already filed Freedom of Information Act requests for similar documentary materials, all to no avail.  *See* Siegel Dec., Exs. 28 & 43.  *See also U.S. Dept of the Treasury v. Pension Benefit Guaranty Corp.*, 301 F.R.D. 20, 30 (D.D.C. 2014); *Denture Cream*, 292 F.R.D. at127 (finding requested materials not cumulative or duplicative because they could not be obtained from plaintiffs and were not already in movant's possession).

Next, any burden imposed by the Subpoenas is minimal given that Movants have now eliminated any request for documents, and merely seek confirmation of some basic facts which can be covered in a short deposition of likely one, or at most two witnesses.  *AT&T*, 2011 WL 5347178, at *7 (granting motion to compel where movant narrowed production requests to seek only those non-duplicative documents central to the case and to eliminate other requests from the scope of its subpoena).  Moreover, as narrowed, the Subpoenas ask for little more than what the

Government Parties have already repeatedly discussed in public fora.  In any event, any burden is far outweighed by the importance of the discovery sought and its potential impact on the Florida Litigation.  As outlined above, the fair report privilege and substantial truth doctrines could be wholly dispositive of the defamation claims against Movants, and the discovery sought is highly relevant to potentially establishing the elements of those doctrines.  *See, e.g., Denture Cream*, 292 F.R.D. at 127.

Finally, "the importance of the issues at stake in the litigation" is far greater than in other civil lawsuits, which may only affect the parties' private interests.  Since Buzzfeed published the Dossier, it has become clear that the Dossier lies at the core of the public controversy regarding Russian interference in the Presidential election and alleged collusion with the Trump Campaign. Most of the key subsequent events at the heart of that controversy — including the recusal of Attorney General Sessions from any Russia investigation, the firing of Director Comey, the appointment of Special Counsel Robert Mueller, allegations that President Trump may have obstructed justice, and the revelation of a June 2016 meeting between Trump campaign officials and several Russian nationals — have been directly related to the Dossier.  If Buzzfeed — or someone else — had not published the Dossier, it would have been impossible for the public to meaningfully follow, understand, and evaluate what is perhaps the seminal political controversy of our time.  A more detailed timeline of some of the key events that have transpired since Buzzfeed's publication of the Dossier on January 10 is attached as Appendix A.

Moreover, since the Dossier's publication, there have been literally hundreds of news reports published by other news organizations around the world that have explored in depth virtually every aspect of the Dossier, including the allegations at issue in the Florida Litigation. Other journalists have investigated topics such as the Dossier's sourcing, suspicion that a recently-murdered ex-KGB chief may have been a source, the progress of investigations into the details of the Dossier, the Dossier's overall credibility, the background and credibility of Christopher Steele, particular individuals discussed in the Dossier such as Aras Agalarov, Alfa Bank, and Carter Page, and parallels between the allegations in the Dossier and the facts of the

20

June 2016 meeting with Donald Trump, Jr. and others in New York.  A list of just a small sample of subsequent news reports, by news organizations other than Buzzfeed, is attached as Appendix B.

Thus, there can be be no serious question that there is an enormous public interest in both the contents and existence of the Dossier.  Yet notwithstanding the critical role that the Dossier has played in both political debate and its coverage by journalists since its publication, the fundamental premises of the Florida Litigation are (1) that Buzzfeed should never have published the Dossier, or at least not any portion whose contents it had not independently verified; (2) that the public should therefore never have had access to it; and (3) that Defendants should be exposed to enormous liability for being the first news organization to provide the public with direct access to the Dossier.  Those stark propositions present "issues at stake in this litigation" of unusual public importance.  This Court is of course not the forum to ultimately resolve those issues.  Rather, this Court need only recognize that the Florida Litigation presents issues of sufficient importance to warrant granting Defendants the opportunity to conduct the very limited discovery sought here that will enable them to present a complete defense, and thus ensure that the Florida court can adjudicate these important issues on the basis of a full evidentiary record that will be available to both sides.

### C.    The Limited Requested Testimony Does Not Implicate any Bona-Fide Classified Information

In their September 15 response to the narrowed Subpoenas, the Government's primary objection was that no testimony of any sort could be provided, because all of the nine topics requested would "implicate" or "reveal" classified information, and/or harm national security by requiring the Government Parties to confirm or deny the existence of classified information.  Importantly, it would be the Government's burden to establish that any privilege or other objection insulates them from having to comply with the Subpoenas at all.  *See AT&T*, 2011 WL 5347178, at *5; *Montesa v. Schwartz*, 2015 WL 13016354, at *1 (S.D.N.Y. Nov. 3, 2015).  Movants cannot anticipate all of the arguments the Government Parties might actually assert in

21

response to this Motion, and reserve the right to fully respond to any such claims in their Reply. For present purposes, Movants will simply point out why the Government is highly unlikely to be able to sustain its burden of justifying its classification objection in the circumstances presented here.

*First,* the Government's attempted "Glomar" response to the narrowed Subpoenas is simply misplaced.  As a general matter, it is far from clear that Glomar responses may properly be interposed at all outside the context of requests for documents made under the Freedom of Information Act.  *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007) (explicitly stating that a Glomar response "is proper if the fact of the existence or nonexistence of agency records falls within *a FOIA exemption*") (emphasis added).  But even if there might be circumstances where the Glomar doctrine might apply to discovery disputes under Rule 45, they are not presented here.

Movants do not seek to compel the production of any documents, nor indeed at this juncture to compel the Government to "confirm or deny" anything.  All this motion seeks is an order compelling the Government Parties to produce witnesses to appear for depositions, at which Movants would be permitted to question them about the specified topics.  Those topics were selected to minimize the likelihood that any questions posed would in fact seek any legitimately privileged or classified information, as discussed in more detail below.

Movants recognize that it may be difficult to foresee the resolution of all privilege or related issues with respect to every question and/or potential answer in advance of a deposition. But that is often the case when a deponent responds to a deposition subpoena by claiming a risk that privileged information might be disclosed.  That is why the preferred means of resolving such issues under Rule 45 is for the deponent to appear at the deposition, and interpose their objections to specific questions so that any disputes may be resolved on the basis of a specific record.  *See, e.g., Byers v. Burleson*, 100 F.R.D. 436, 439 (D.D.C. 1983) ("A party who asserts a privilege in response to a notice of deposition should attend the deposition and submit to the court for resolution any matters which allegedly violate the privilege."); *see also District Title v. Warren*, 2017 WL 2462489, at *5 (D.D.C. June 2, 2017) ("[N]o authority supports the

22

proposition that the threat by a witness to claim such privileges is a basis upon which to preclude the issuance of a subpoena. Rather, the applicable authorities require that claims of such privileges be made in response to a specific question or questions actually posed, or specific documents actually requested."); *Goldstein v. F.D.I.C.*, 494 B.R. 82, 90 (D.D.C. 2013) (finding that the possibility that a deponent will lodge privilege objections "is not a proper ground for quashing the subpoena *ad testificandum*, but rather a reason for objecting to certain questions on a case by case basis"). That is all the relief this Motion seeks.

*Second*, to say the least, neither Movants — nor anyone else — needs the Government Parties to "confirm or deny" the existence of the Dossier, given that BuzzFeed published the document, millions of people have viewed it, scores of news organizations have written about it, and it has been at the epicenter of both domestic and international political debate for the past nine months. In any event, the record makes clear that the Government has repeatedly "confirmed . . . the existence of the Dossier" as well as "any investigation or other activities related to it." Within days of its publication, ODNI and Vice-President Biden confirmed that the President and President-elect were briefed on the "private security document", and that the FBI was "track[ing] down" the subject. Since then, almost everyone who was a participant in the January 6 briefing that first drew attention to the Dossier — including President Trump and former Directors Comey, Clapper and Brennan — have all discussed in more detail both those events and the general existence of an investigation into the Dossier. So have dozens of United States Senators and Congressmen in the course of the multiple investigations into Russian interference in the election since January 2017. *See generally supra* at 4-10.

Even within the FOIA context, it is well-established that prior disclosure of records can defeat an agency's Glomar response and assertion of national security and/or privilege exemptions. *See, e.g., N.Y. Times v. D.O.J.*, 756 F.3d 100, 116-17 (2d Cir. 2014); *Wolf*, 473 F.3d at 378. Yet here the extent of official acknowledgment of the subject-matter of the requested testimony, as well as the degree to which the Dossier is obviously in the public domain, goes far beyond other circumstances in which courts have found disclosure was warranted even under the

23

more restrictive requirements of the FOIA. *A.C.L.U. v. C.I.A.*, 710 F.3d 422, 427-29 (D.D.C. 2013) (rejecting Glomar response where the President of the United States and other officials had acknowledged existence of requested information); *Marino v. Drug Enforcement Admin.*, 685 F.3d 1076, 1082-83 (D.D.C. 2012) (concluding that the public disclosure exception applied to request for case file where DEA had already publicly revealed information about its existence); *Smith v. C.I.A.*, 2017 WL 1194166, at *4 (D.D.C. Mar. 30, 2017) (finding it "neither logical nor plausible" that the CIA does not have the information requested about budget line items related to intelligence assistance for Israel in light of the President's public statements concerning such information). In fact, the testimony Movants seek largely tracks the public statements already made by the Government Parties.

Similarly, Movants have narrowed the Subpoenas to avoid seeking genuinely classified information. Movants recognize that while the Government Parties have not concealed the existence of briefings about and investigations into the Dossier, current and former officials have generally declined to disclose more specific details, such as their assessment of specific sources and/or any investigative findings. For example, former Director Comey's June 8 testimony before the Senate Intelligence Committee contained the following exchange:

> **SENATOR BURR:** In the public domain is this question of the "Steele Dossier," a document that has been around out in for over a year. I'm not sure when the FBI first took possession of it, but the media had it before you had it and we had it. At the time of your departure from the FBI, was the FBI able to confirm any criminal allegations contained in the steel document?

> **MR. COMEY:** Mr. Chairman, I don't think that's a question I can answer in an open setting because it goes into the details of the investigation.

Siegel Decl. Ex. 49. As a result, although the kind of information Senator Burr requested could also be highly relevant to the Florida Litigation, Movants have narrowed the Subpoenas to exclude questions about subjects like investigative results or conclusions, either formal or informal, of anything in the Dossier. In these circumstances, Movants' strong need for the limited information sought far outweighs the Government Parties' desire to avoid proceeding

24

with discovery at all. *See Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C. Cir. 1996) (requiring consideration of whether, on balance, the need for information outweighs any privilege).

## CONCLUSION

For all of the foregoing reasons, Movants respectfully request that this Court compel the Government Parties to produce one, or if necessary at most two designated witnesses to appear for a deposition whose questions will be limited to the topics listed herein.

Dated:  September 27, 2017

Respectfully submitted,

By: _____
Nathan Siegel
Katherine M. Bolger
Adam Lazier
Amy Wolf
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
(T): (202) 973-4200
(F): (202) 973-4499
nathansiegel@dwt.com
katebolger@dwt.com
adamlazier@dwt.com
amywolf@dwt.com

OF COUNSEL:
Allison Lucas
Nabiha Syed
BuzzFeed, Inc.
11 E. 18th Street, 13th Floor
New York, NY 10003

*Attorneys for Movants BuzzFeed, Inc. and Ben Smith*

# APPENDIX A

January 2017

- At the confirmation hearing of Attorney General Jeff Sessions, Senator Al Franken asks Sessions about the CNN reports of a document containing evidence of collusion between Russia and the Trump campaign. Siegel Dec., Ex. 29. Session responds by saying that he has never had any communications with the Russians. *Id.*

February 2017

- National Security Advisor Michael Flynn resigned after reports emerged that he had misled Vice President Pence about meetings with the Russian ambassador, Sergie Kislyak. Siegel Dec., Exs. 26-27, 34. As many news reports noted, Flynn made a trip to Russia in December 2015 and the Dossier alleged that he was one of the key officials Russia sought to cultivate by funding his trip. *Id.*, Ex. 26. Shortly before his resignation, Flynn reportedly recommended to President Trump that Montenegro be admitted to NATO, which some commentators opined seemed consistent with the Dossier's allegation that the Trump team had agreed to "raise US/NATO defense commitments in the Baltics and Eastern Europe to deflect attention away from Ukraine . . ." *Id.*, Ex. 15.

- CNN reported that U.S. law enforcement officials had corroborated that some of the communications between foreign nationals alleged to have taken place by the Dossier did in fact occur. *Id.*, Ex. 25.

March 2017

- News organizations report on March 1 that Attorney General Sessions' answer at his confirmation hearing in response to a question about the Dossier appears to be inaccurate. *Id.*, Ex. 29. The next day, Sessions recused himself from the Russia investigation. *Id*, Ex. 31.

- Senator Grassley publicly released a March 6 letter he sent to Director Comey, demanding that Comey provide the Senate Judiciary Committee with specific information about any relationship between the FBI and Christopher Steele, the Dossier's primary author. *Id.*, Ex. 32.

- Comey and Admiral Michael Rogers testified before the House Intelligence Committee on March 20. *Id.*, Ex. 33. Rep. Adam Schiff read from portions of the Dossier and urged for the formation of an investigative commission to probe the alleged Trump-Russia connections. *Id.* Rep. Schiff opined that "many claims within Steele's dossier are looking more and more likely." *Id.*

- Senator Grassley released a letter to Fusion GPS, who hired Steele, demanding documents about its relationship with Steele and any with the FBI. *Id.*, Ex. 35.

- Senator Grassley calls on the Justice Department to investigate Fusions GPS's ties to Russia. *Id.*

4831-3301-6910v.8 0100812-000009

April 2017

- CNN reports that the FBI used the Dossier in the fall of 2016 to obtain a FISA warrant to monitor Carter Page, a Trump advisor who is mentioned several times in the Dossier. *Id.*, Ex. 37.

- Senators Feinstein and Grassley send a letter to Director Comey, questioning alleged inconsistencies in his account of the FBI's relationship with Steele and seeking additional information about that issue. *Id.*, Ex. 38.

May 2017

- Director Comey testifies before the Senate Judiciary Committee and is asked numerous questions about the Dossier, Steele, Carter Page and Flynn. *Id.*, Ex. 40.

- James Clapper testifies before the Senate Judiciary Committee on May 8 and said the Intelligence Community looked into the Dossier but was not able to corroborate the underlying sources. *Id.*, Ex. 41.

- President Trump fired Director Comey on May 9, with a letter noting that Comey had told him three times he was not under investigation. *Id.*, Ex. 42. Comey would later testify that those conversations were primarily related to allegations in the Dossier. *Id.*, Exs. 45-46.

- Deputy Attorney General Rod Rosenstein appoints Robert Mueller as Special Counsel for the Russia investigation. *Id.*, Ex. 44.

- Former CIA Director Brennan testified before the House Intelligence Committee, where he was asked several questions about the Dossier and confirmed his understanding that the FBI was investigating it. *Id.*, Ex. 45.

- On May 30 CNN reported that investigators found that Russian officials had been discussing derogatory information that allegedly could be used to influence Trump, and summarized similar allegations made in the Dossier. *Id.*, Ex. 46.

June 2017

- Former Director Clapper in a public speech on June 7 said that President Trump had "asked me to publicly refute the infamous dossier, which I could not and would not do." *Id.*, Ex. 47.

- Former Director Comey on June 7 releases his written statement to the Senate Intelligence Committee, which describes in detail his briefing of then President-elect Trump about the Dossier, his explanation of why the Dossier could trigger a counter-intelligence investigation, his subsequent meetings in which President Trump raised the Dossier and asked Comey to publicly confirm that he was not under investigation. *Id.*, Ex. 48.

- On June 8 former Director Comey testified in public and answered multiple follow-up questions about the Dossier-related issues discussed in his written statement. *Id.*, Ex. 49.

<u>July 2017</u>

- Multiple news reports reveal a meeting in June 2016 in New York with Donald Trump, Jr., other campaign officials and several Russians following a promise of damaging information about Hilary Clinton. *Id.*, Exs. 50-54. The meeting was arranged by Aras Agalarov, who is prominently described in the Dossier as the "Azeri business figure [who] had been closely involved with TRUMP in Russia and would know most of the details of what the Republican presidential candidate had got up to there." Compl., Ex. 1 at 27. Numerous media reports describe the relationship between the allegations in the Dossier and the facts concerning the meeting. *See*, *e.g*., *id*. at Exs. 55-63.

- In a July 19 interview with the *New York Times*, President Trump confirmed that Director Comey briefed him about the Dossier two weeks prior to his inauguration. *Id*., Ex. 63. He accuses Comey of doing that in order to signal to the President-elect that he had "leverage" over him, in an effort to keep his job. *Id*.

- In a July 27 press conference, press secretary Sarah Huckabee Sanders discusses reports that Fusion GPS had done work for Russia, saying that this discredits the Dossier. *Id.*, Ex. 64.

<u>August 2017</u>

- News reports state that members of the House Intelligence Committee traveled to London to try to meet with Steele and that the Senate Intelligence Committee was also seeking information from Steele. *Id.*, Ex. 66.

- Glenn Simpson from Fusion GPS met with the Senate Judicary Committee on August 22. *Id.*, Exs. 67-68.

4831-3301-6910v.8 0100812-000009

## APPENDIX B

<u>Assessing the Merits of Allegations in the Dossier</u>

- http://www.bbc.com/news/world-us-canada-38589427

- https://www.theguardian.com/commentisfree/2017/jan/12/donald-trump-russia-dossier-frighteningly-true

- http://www.cnn.com/2017/02/10/politics/russia-dossier-update/

- http://www.bbc.com/news/world-us-canada-39435786

- https://www.washingtonpost.com/amphtml/politics/trumps-business-sought-deal-on-a-trump-tower-in-moscow-while-he-ran-for-president/2017/08/27/d6e95114-8b65-11e7-91d5-ab4e4bb76a3a_story.html

<u>Progress of Investigation into the Dossier</u>

- http://www.nbcnews.com/news/us-news/fbi-s-comey-told-trump-about-russia-dossier-after-intel-n706416

- https://www.lawfareblog.com/why-are-trump-allegations-hanging-around-when-they-havent-been-substantiated

- https://www.theguardian.com/us-news/2017/jan/13/uk-british-former-moscow-ambassador-andrew-wood-trump-dossier

- http://www.cnn.com/2017/03/09/politics/fbi-investigation-continues-into-odd-computer-link-between-russian-bank-and-trump-organization/index.html

- http://www.cnn.com/2017/05/23/politics/john-brennan-trump-russia/index.html

- http://www.cnn.com/2017/06/07/politics/james-clapper-watergate-russia/index.html

- http://www.rollingstone.com/politics/features/what-we-learned-from-comeys-pre-hearing-statement-w486494

<u>Sourcing of the Dossier</u>

- http://www.telegraph.co.uk/news/2017/01/27/mystery-death-ex-kgb-chief-linked-mi6-spys-dossier-donald-trump/

- http://abcnews.go.com/Politics/us-russian-businessman-source-key-trump-dossier-claims/story?id=45019603

- http://washingtonmonthly.com/2017/07/18/trumps-buddy-aras-agalarov-in-the-steele-dossier/

- http://www.rawstory.com/2017/08/british-spy-christopher-steele-has-given-fbi-the-names-of-his-sources-for-trump-dossier-report/

4831-3301-6910v.8 0100812-000009

Credibility of Christopher Steele

- http://www.independent.co.uk/news/world/americas/donald-trump-russia-dossier-file-investigation-hacking-christopher-steele-mi6-a7526901.html

- https://www.washingtonpost.com/politics/fbi-once-planned-to-pay-former-british-spy-who-authored-controversial-trump-dossier/2017/02/28/896ab470-facc-11e6-9845-576c69081518_story.html?utm_term=.b027bd1cfcda

Individuals Mentioned in the Dossier

- https://www.nytimes.com/2017/02/13/us/politics/donald-trump-national-security-adviser-michael-flynn.html?_r=1

- https://www.bloomberg.com/news/articles/2017-03-17/alfa-bank-of-russia-says-cyberattacks-falsely-tie-it-to-trump

- https://www.washingtonpost.com/world/national-security/fbi-obtained-fisa-warrant-to-monitor-former-trump-adviser-carter-page/2017/04/11/620192ea-1e0e-11e7-ad74-3a742a6e93a7_story.html?hpid=hp_hp-top-table-main_page710pm%3Ahomepage%2Fstory&utm_term=.c2043a001bd5

- http://www.cnn.com/2017/04/18/politics/fbi-dossier-carter-page-donald-trump-russia-investigation/index.html

- https://www.axios.com/russian-lobbyists-hourly-rate-has-soared-since-his-meeting-with-trump-jr-2481509231.html

Donald Trump, Jr. June 2016 Meeting's Relationship to the Dossier

- http://www.businessinsider.com/donald-trump-jr-email-leaked-buzzfeed-trump-russia-document-2017-7

- https://theintercept.com/2017/07/11/russian-oligarch-plotted-aid-trump-named-private-intelligence-dossier/

- http://dailycaller.com/2017/07/12/does-the-steele-dossier-describe-what-happened-in-trump-tower-meeting/

- https://www.washingtonpost.com/amphtml/politics/trump-dictated-sons-misleading-statement-on-meeting-with-russian-lawyer/2017/07/31/04c94f96-73ae-11e7-8f39-eeb7d3a2d304_story.html

- https://www.nytimes.com/2017/08/21/us/rinat-akhmetshin-russia-trump-meeting.html?auth=login-email